F8ITAGUA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   AGUDAS CHASIDEI CHABAD OF THE
    UNITED STATES,
4
                    Plaintiff,
5
            v.                              15 MC 184 P1
6
    RUSSIAN FEDERATION, et al.,
7
                    Defendants.
8
    ------------------------------x
9                                       New York, N.Y.
                                        August 18, 2015
10                                      11:00 a.m.

11  Before:

12              HON. KATHERINE P. FAILLA,

13                                      District Judge

14                      APPEARANCES

15  ROTHWELL FIGG
         Attorneys for Plaintiff
16  BY:  DANIEL McCALLUM

17  DAVIS & GILBERT
         Attorneys for Movant Sberbank CIB USA, Inc.
18  BY:  JAMES SERRITELLA
         CHRISTOPHER MEYER
19

20

21

22

23

24

25

F8ITAGUA

1              (In open court)

2              DEPUTY CLERK:  We're here in the matter of Agudas

3     Chasidei Chabad of the United States versus Russian Federation,

4     et al.

5              Counsel, please identify yourselves for the record,

6     beginning with the movant.

7              MR. SERRITELLA:  Good morning, your Honor, James

8     Serritella from Davis & Gilbert on behalf of non-party movant

9     Sberbank CIB USA, Inc.  I have with me my colleague,

10    Christopher Meyer.

11             THE COURT:  Good morning to both of you, thank you.

12             MR. McCALLUM:  Good morning, your Honor, Daniel

13    McCallum from Rothwell Figg on behalf of Chabad, the movant on

14    the Rule 45(f) motion opposing the motion for the protective

15    order and the plaintiff in the underlying litigation before

16    Judge Lamberth.

17             THE COURT:  Before you sit down, sir, I want to ask

18    you about that litigation, because I suspect you have more

19    knowledge of it than the folks at the front table.

20             Can you tell me, please, or could you provide more

21    detail to what is said in your submissions regarding

22    proceedings that you have in the near term before Judge

23    Lamberth on this case.

24             MR. McCALLUM:  Yes, your Honor.  On August 7, Judge

25    Lamberth issued an order scheduling a hearing on August 20,

F8ITAGUA

1    this coming Thursday.  And there has been pending before Judge

2    Lamberth a motion for an interim order accruing -- there's been

3    sanctions accruing since 2013 where Judge Lamberth issued

4    sanctions against the Russian Federation of $50,000 a day.

5    Chabad moved for that sanctions order to memorialized into a

6    judgment so there could be one number, and that hearing is

7    before Judge Lamberth I believe 2:00 p.m. this coming Thursday.

8    I'm not sure what other matters the judge may take up, but that

9    is the purpose of that hearing.

10           THE COURT:  And just so I'm understanding what is

11   going on, is it going to replace the prior order that was

12   entered with the default judgment imposing a fixed sum and

13   going to aggregate all of the $50,000 a day that's been

14   accruing in sanctions as of Thursday?

15           MR. McCALLUM:  So there's two things, there's the

16   underlying judgment, he issued a judgment in 2010, and that is

17   the judgment on Chabad's actual papers, the issuing order that

18   Chabad is entitled to those papers that the Russian Federation

19   has.

20           THE COURT:  Let me stop you for a moment.  That order,

21   it's the library and the artifacts, or is there a monetary

22   value that's been assessed for them?

23           MR. McCALLUM:  No, your Honor is correct, it's just

24   Chabad's papers, the library and the archive.

25           THE COURT:  Separate and apart from that, because of

F8ITAGUA

1    the non-participation of the Russian Federation, there has been

2    a contempt order issued, and Judge Lamberth has found,

3    beginning in 2013, that there's a $50,000 per day sanction,

4    correct?

5              MR. McCALLUM:  Yes.

6              THE COURT:  And this Thursday is adding up that

7    sanction?

8              MR. McCALLUM:  That is what Chabad has moved for.

9              THE COURT:  Aspirationally that's what you're going

10   for.

11             MR. McCALLUM:  Correct.

12             THE COURT:  Would the thought be another year or six

13   months from now you will have another proceeding to add up some

14   more?

15             MR. McCALLUM:  Perhaps.  Our wishful thinking is that

16   we would not need that and we would have the collection by that

17   time.  If necessary.

18             THE COURT:  I'm sorry to have not even thought of that

19   as a possibility.

20             Okay.  Thank you very much.  And why don't you have a

21   seat for a moment and let me talk to both sides.

22             I have gotten two different sets of papers, as you are

23   aware, there is a motion for protective order and more recently

24   a motion for transfer to the District of Columbia.  I have read

25   the papers.  I do want to talk to the parties a little bit

F8ITAGUA

1    about this and then we'll see what happens.

2              What I will ask is if and to the extent any of this is

3    useful to Judge Lamberth, perhaps the parties will arrange at

4    the close of these proceedings to get a transcript of this

5    conference, but we'll see.  Perhaps, if you excuse my

6    grandmother's expression, we'll burn that bridge when we get to

7    it.

8              Mr. McCallum, I want to talk to you on the protective

9    order motion.  Let me ask, Sberbank is this broker-dealer

10   entity in the United States, is there -- at least that's how

11   it's been described to me -- anything else in the United

12   States, sir?

13             MR. McCALLUM:  Not that I'm aware of, although we did

14   point out in the papers that it's Sberbank CIB, the corporate

15   business, the Russian entity, as noted on its web site, that it

16   has a New York office, and I took that to be the New York

17   entity that is here today, Sberbank USA.

18             THE COURT:  Let me ask you this, sir, and we may be

19   running up on the limits of my own knowledge, but I remain

20   fascinated by the Daimler v. Bauman decision issued a couple

21   years ago and the issue of general jurisdiction and the entity

22   being at home in a particular place.  And I didn't think that

23   CIB -- and I will use that for the moment to distinguish the

24   Russian entity from the affiliate that's before me -- I didn't

25   get the sense that they were at home in New York.  Do you

F8ITAGUA

1    disagree, sir?

2         MR. McCALLUM:  Well, your Honor, I think that raises a

3    separate issue, because the entity that we subpoenaed here was

4    Sberbank USA, and that is who Mr. Serritella is representing.

5    And we are seeking the documents and information from the

6    Russian entities under the doctrine of custody and control.

7         So I don't think your Honor needs to address whether

8    Sberbank CIB, the Russian entity, would be at home in this

9    district.  I think perhaps if we had subpoenaed them and served

10   them with a subpoena here they would be under a different

11   jurisdictional analysis, and your Honor, I just don't want to

12   speculate whether under Daimler they would be at home here.

13        THE COURT:  And I certainly don't want you to

14   speculate, especially given that I sprung this question on you

15   this morning.

16        Why I was thinking that, sir, is one of the things

17   that interests me about Daimler or Bauman, depending who you

18   are and how you want to refer to it, is the idea is that

19   discovery orders are somewhat coextensive with the personal

20   jurisdiction that a court has over an entity.  If I don't have

21   jurisdiction over CIB, am I doing an end run around Daimler by

22   allowing a subpoena to be issued to its U.S. affiliate to be

23   the gateway for information about CIB?  That's really my

24   question.

25        MR. McCALLUM:  I don't think so, your Honor, because I

F8ITAGUA

1    don't think Daimler was a complete reworking of the law.  And

2    prior to Daimler and the cases we cite there are these numerous

3    cases that discuss getting information and documents from an

4    entity based on the custody and control standard that the

5    subsidiary or the parent has access and ability to access

6    documents from the other entity.  And so I don't think what

7    we're doing here is an end run, no, your Honor.

8         THE COURT:  And you have talked to me about custody

9    and control, and you defined it as access or ability to access,

10   but I think your adversaries in this proceeding at least have

11   spoke about it more in terms of whether in the ordinary course

12   of business the affiliate in the U.S. had occasion to have

13   access to this information.  I want to make sure I understand

14   your argument about the metes and bounds of what is custody and

15   control for these purposes.

16        MR. McCALLUM:  Yes, the case law states that the

17   custody and control standard is met when there's -- among other

18   circumstances, when the party at issue has access or the

19   ability to access the documents and information that the movant

20   is seeking.

21        THE COURT:  But let me stop you for a moment, sir,

22   because I guess my concern is that would suggest -- well, it

23   would be the rare company, I would think, where an affiliate

24   would not be able at least to ask for access to documents held

25   by another affiliate by the parent.  Perhaps I'm not as

F8ITAGUA

familiar with companies that have a more stringent sharing of
information policy, but it would seem to me that any affiliate
could say as to its fellow affiliates it has the ability to ask
for the information.  I would have thought it required more
than that.

          MR. McCALLUM:  It could be the ability to ask and
receive.  And that is one thing that Sberbank has not said
here, as we noted in our reply papers, that they said they do
not access -- the active tense of the verb -- in the ordinary
course of the business, without elaborating what that phrase
means.  They did not say the opposite, that they do not have
access to that information.

          And for example, in the SEC v. Bancorp case that they
cite to, the court went through pains to explain the entity
could not access that information.  Here we don't have any
statements from Mr. Levy -- Mr. Levy being the declarant both
in support of Sberbank's moving papers and in reply papers --
and in the reply papers he does not say they cannot access, he
says they do not access.  And we submit that the correct
standard is the ability to access on request or otherwise.

          THE COURT:  So if Mr. Meyer or his colleague said to
me today no, we can't access it, that would matter?

          MR. McCALLUM:  Well, I think it would matter.  But,
your Honor, I submit that we would still need -- although I
respectfully would believe what my colleague would say, that

F8ITAGUA

1    would be a topic I think that would warrant the deposition to

2    explore the bounds of that, given we have two declarations

3    where that has not come up.

4            THE COURT:  You led me to my next question, sir, which

5    is I think what I'm understanding from your papers or response

6    to be is not that you are necessarily going to come down and

7    force the production of documents, but at this time really what

8    you're seeking is simply information.  You want confirmation of

9    the statements made in these papers and you want to understand

10   better why it is they believe -- Sberbank USA believes it does

11   not have the ability or it would not be appropriate for them to

12   give you documents regarding CIB.  Is that correct?

13           MR. McCALLUM:  Yes, your Honor.  I think the scope of

14   the deposition would be what information can Sberbank USA

15   access from its Russian entity and what type of information

16   that Russian entity does in fact have.  We would submit that it

17   would be proper for them to learn that information before the

18   deposition as well as exploring the balance of what it can get

19   access to.  And as your Honor correctly predicts, in the event

20   that they do have such information and such documents, perhaps

21   that would be the next step, but we believe this is the most

22   efficient way to do things.

23           THE COURT:  Sir, so you don't have to keep standing up

24   and sitting down, may I hear from you, please, on the motion to

25   transfer.  In particular, sir, I want to understand the nature

F8ITAGUA

1    of the current proceedings, which I hinted at in my first

2    question to you, and the contemplated proceedings before Judge

3    Lamberth, and why you believe that it makes sense to have this

4    matter transferred to him.

5          MR. McCALLUM:  So I think there are two interrelated

6    reasons for transferring this.  First is, as your Honor

7    previewed it, Judge Lamberth's overall familiarity with the

8    case.  And we noted that there are detailed facts in this case

9    going all the way back to the Bolshevik Revolution in 1917 that

10   Judge Lamberth detailed in his opinions.

11         THE COURT:  I'm sorry to cut you off, but he doesn't

12   need to know about the Bolshevik Revolution or the facts in the

13   case relating to that in order to address the issues of the

14   interrelationship or not between these entities and Sberbank,

15   does he?

16         MR. McCALLUM:  It does not directly go to the legal

17   question here, it will help inform his judgment.  And also

18   Judge Lamberth's rulings have dealt extensively with the

19   Foreign Sovereign Immunities Act.  So to the extent there are

20   issues with the underlying facts or anything that could impact

21   the Foreign Sovereign Immunities Act, his knowledge will help

22   deal with that.

23         And turning to the advisory committee notes to Rule

24   45(f), and in Rule 45(f) itself there's the idea of whether

25   issues are likely to arise again such that there might be the

F8ITAGUA

1    possibility of inconsistent rulings.  The advisory committee

2    notes that to avoid inconsistent rulings, a transfer may be

3    appropriate to the court issuing the subpoena.

4          And we submit that that is precisely the situation

5    here because, as your Honor is aware, we subpoenaed Sberbank

6    USA, a US entity, seeking information from the corporate parent

7    as well.  We're seeking information about Russian assets.  So

8    it is likely that -- Chabad does intend to subpoena other

9    entities, and we have in fact subpoenaed other entities, that

10   other entities would raise this defense as well.  So to the

11   extent that one court, that being Judge Lamberth, could rule on

12   these issues, we believe it makes sense and is consistent with

13   what Rule 45(f) states.

14          THE COURT:  Mr. McCallum, let me ask you this perhaps

15   more pointedly than I mean to.  I think I understand you to be

16   saying that at this stage in the litigation you're not

17   necessarily expecting that the Russian Federation will come in

18   and restart its defense of the matter, and instead your

19   litigation has progressed to the point of being an exploration

20   basically of post-judgment remedies and you're exploring where

21   assets might be.  Is that correct, sir?

22          MR. McCALLUM:  Yes, your Honor.  And I think you're

23   possibly highlighting something that was raised by Sberbank in

24   its opposition papers, and this is the idea of the merits stage

25   of litigation versus the enforcement stage.

F8ITAGUA

1          THE COURT:  I know that is what they said.  I'm

2     highlighting it for a different reason, sir, because now

3     there's a subpoena to Sberbank, there's a subpoena to Ketchum,

4     and you hinted in your papers that more will be coming.

5          I think what I'm trying to understand, sir, is are you

6     telling me now that for the foreseeable future in this

7     litigation your client's efforts will be directed at obtaining

8     information from entities who have some tie to the Russian

9     Federation or its accounts so you can figure out if there are

10    any assets here on which you can make a claim?

11         MR. McCALLUM:  That's correct.

12         THE COURT:  It's not for the reasons he said, although

13    I know his point.  I'm trying to figure out if you're telling

14    me this is the beginning of a phase of litigation where all

15    you're really going to be doing is asking for information from

16    people.  Because I presume what you're saying is that dovetails

17    with the notion that Judge Lamberth should be deciding these

18    issues.  I'm not saying I agree with that, but that's the

19    argument you're making, correct, sir?

20         MR. McCALLUM:  You're correct.

21         THE COURT:  Is that exceptional circumstances, sir?

22         MR. McCALLUM:  Well, we contend that under the

23    committee notes it does state that the same issues are likely

24    to arise again.  And in Wultz it was aspirational.  It was not

25    that the same issues had already arisen, it was that in the

F8ITAGUA

1   _Wultz_ case in the District of Columbia that they stated they

2   intended to subpoena additional Israeli officers, and that

3   therefore the state secret issue that was pending before the

4   court there on a motion to quash was likely to arise again, and

5   it made sense for the Southern District of New York to handle

6   all those because that was where the litigation was pending.

7           We believe that our cases parallel here because

8   Sberbank has raised this issue of intercorporate subpoena

9   compliance, and we intend to and plan to subpoena additional

10  entities.  So to the extent those additional entities raise the

11  same defense, that issue is likely to arise, and we would like

12  to avoid inconsistent rulings.

13          THE COURT:  I'm not saying that's a bad thing.  I

14  guess I'm turning for a moment to the advisory committee notes

15  to the amendment, and I thought one of the things that they

16  said was that one of the principal issues -- yes, here it is,

17  the protection of local non-parties.  And in fact, it says the

18  prime concern should be avoiding burdens on local non-parties

19  issuing -- sorry, local non-parties subject to subpoenas, and

20  it should not be assumed that the issuing court is in a

21  superior position to resolve the interrelated motions.

22          Could you speak to that issue, sir, because I believe

23  the local non-party issue is something that was raised by

24  Mr. Serritella and Mr. Meyer, and I thought I understood you to

25  be saying that they're not the local non-parties that are

F8ITAGUA

1    contemplated by this rule.  I would like to understand that a

2    little better, sir.

3           MR. McCALLUM:  Yes, your Honor.  So in several cases,

4    and in the short time span that Rule 45(f) has been in effect,

5    we cite the <u>Judicial Watch</u> case and we cite to others where the

6    idea that a national entity is not really the type of entity

7    that was considered a local party such that local interests

8    under Rule 45(f) were being contemplated.

9           Sberbank USA is, to be sure, the arm of a Russian

10   international bank.  And while it is located here in New York,

11   we submit that it is not the type of local entity that Rule

12   45(f) contemplates because of its international presence in

13   connection to international entities.  And relatedly, other

14   courts have stated that to the extent there is any type of

15   burden, it could be alleviated through perhaps a telephonic

16   hearing with counsel for Sberbank USA.

17          And I think most importantly is that we're not

18   contending that Sberbank USA has to comply with the subpoena in

19   the District of Columbia.  So in the event the order was

20   transferred and it was not -- the protective order was not

21   enforced and the deposition were to go forward, that could

22   occur here in the Southern District of New York, minimizing any

23   burdens to the actual entity itself.

24          THE COURT:  Thank you very much.  Let me talk to

25   whoever is taking the laboring oar at the front table.

F8ITAGUA

1              Mr. Serritella.

2              MR. SERRITELLA:  Good morning, your Honor.

3              THE COURT:  If you could help me and tell me, am I

4    unnaturally fixating on balance, sir?  You can tell me, I won't

5    be offended.

6              MR. SERRITELLA:  Let me clear the air, Sberbank USA is

7    a distinct and separate entity.  It's a Delaware corporation.

8    It's headquartered in New York.  So we're talking about a US

9    entity here.  It's not a Russian entity.  And so I think the

10   point here is that the plaintiff is trying to get access to

11   documents or information in the hands of the Russian parent,

12   the indirect Russian parent, Sberbank Russia.  And Sberbank USA

13   doesn't have that information, it operates separate and

14   distinctly from Sberbank Russia.  It's a 17-man office in New

15   York.  It's a broker-dealer.  It has a very specific operation.

16             THE COURT:  Could you give me a sense, sir, of the

17   size of the Russian entity?  I assume some hundreds or

18   thousands.

19             MR. SERRITELLA:  I think it's the largest bank in

20   Russia.

21             THE COURT:  Okay.

22             MR. SERRITELLA:  The point I was making, your Honor,

23   is this entity has a very limited role in the United States.

24   They trade securities on behalf of US clients that want

25   exposure to Russian stocks, and that's really what their

F8ITAGUA

operation is focused on.  They don't have access to account

level information in the hands of any affiliate, any foreign

affiliate.  And so it's really a limited role that they serve

here, and they operate distinctly from what is going on in

Russia.

THE COURT:  Can I understand, you just said the magic

words, "They don't have access."  Are you saying there's no set

of circumstances under which they could obtain access, or are

you going to tell me this is the ordinary course of business

argument you were making in your papers?

MR. SERRITELLA:  To answer your question, your Honor,

I think your Honor touched on something that was the point I

was going to raise, that if you said the standard was simply

could an entity access information in the hands of an

affiliate, then you would throw the standard control out the

window.  You could have an entity respond to discovery requests

on behalf of any affiliate, because "could access," what does

that mean?  That's not the standard anyway.  I think the cases

consistently make clear when you're requiring an entity to

respond on behalf of a parent or any affiliate, the question of

control turns on whether that party could access that

information in the ordinary course of business and was involved

in the transaction at issue.  That's not going on here.

THE COURT:  Sorry, you added another thing.  I heard

about the ordinary course of business, but then you said "and

F8ITAGUA

1    was involved in the transaction."  I don't know that I read

2    that anywhere.

3            MR. SERRITELLA:  Let me clarify.  In those cases there

4    was an underlying transaction where, in the cases where the

5    courts say that the party does have to respond on behalf of an

6    affiliate, the parents were actually involved in the

7    transaction.  I think in the <u>Camden Iron</u> case that the

8    plaintiffs cite, which by the way does not support their

9    argument that it could access the standard, if you look at that

10   case, the parent actually was involved in negotiating the deal.

11   When there was a breach of contract, the Court said wait a

12   minute, you were involved in this deal so of course you have to

13   respond to the discovery request because it was a free flow of

14   information in the ordinary course of business.

15           What is different in this case is that we're not

16   talking about a transaction, we're actually talking about

17   account level information in the present.  That's what the

18   plaintiff wants.  And so to get into whether or not there's

19   access now or then or whatever, all that matters is can we

20   access this information presently in the ordinary course of

21   business.  And the record here clearly shows that Sberbank USA

22   cannot because it's not involved in the affairs of the Russian

23   parent.

24           And so I think that ends the analysis right there.

25   They don't get a deposition.  They don't get to depose our

F8ITAGUA

1   witness and make that witness testify as to information in the

2   hands of the Russian parent because there's no access to that

3   information.

4           THE COURT:  I understand that argument.  I guess I

5   want to modify it slightly.  I understand what Mr. McCallum was

6   seeking to do in this deposition was really probe what access

7   the US entity had.

8           MR. SERRITELLA:  But that's not necessary.

9           THE COURT:  Because why?  Because your submissions are

10  enough?

11          MR. SERRITELLA:  Yes.  The standard is access in the

12  ordinary course of the business.

13          THE COURT:  What if he doesn't believe you, or what if

14  he wants to see -- what if you've done things under a

15  particular standard and he wants to try it under a more

16  expansive standard?

17          MR. SERRITELLA:  I think that's a separate issue, your

18  Honor, and the plaintiff never indicated they don't believe

19  what is in that declaration, so I don't see that that's

20  relevant.

21          THE COURT:  Fair enough.  But if they held a different

22  view from you about what custody or control meant, could they

23  not probe it in the deposition?  They're not today asking for

24  the documents, they're asking for this deposition.

25          And I was wondering also if you could speak to the

F8ITAGUA

related issue about how complicated this deposition would be.
Because I understand it's a burden.  You being here today is a
burden, it's a question how much of a burden is permitted.

          MR. SERRITELLA:  I think that the answer to your
question is that it doesn't matter.  It doesn't matter.  What
matters is:  What is the standard?  The standard that the
plaintiff is proposing is incorrectly legally.  So you can't --
the plaintiff can't propose an incorrect legal standard to get
a deposition.  That's essentially what they're trying to do.
You have to look at the law.  And the law says that you only
have to provide information on behalf of an affiliate if you
have access to that information in the ordinary course of
business.  So to put the cart before the horse to say let's get
a deposition to find out what they really have access to based
on an improper, incorrect legal standard doesn't fly.

          THE COURT:  Fair enough.  Are you also saying, sir,
that given you win, or you believe you win on the standard, the
fact that it's not an especially burdensome deposition --
because in a quiet moment you could say it wasn't an especially
burdensome deposition -- you say that's not enough because they
shouldn't be able to get even a not burdensome deposition on
this basis.

          MR. SERRITELLA:  I think your Honor touched on
something regarding burden.  My client spent a lot of resources
responding to the subpoena.  We actually attempted to get the

F8ITAGUA

1   plaintiff to narrow the scope of the subpoena on several

2   occasions and they refused to do so, so we were left with no

3   choice but to go into court and seek a protective order.

4          So at this point the burden is getting greater and

5   greater.  And then on top of today to sit for another

6   deposition and incur additional costs just isn't fair to my

7   client.  And Rule 45, in our view, protects them from that.

8   Because if the deposition were limited to what the plaintiff

9   actually asked, which is information in the actual possession

10  of our client, they would be told what they already know and

11  what they don't contest.  And that's our claim.  Doesn't have

12  any information that's responsive to the subpoena, with the

13  exception of an organizational chart.

14         But to get at the real meat of what they're trying to

15  do, which Mr. McCallum talked about, which is enforce a

16  judgment and to find accounts to levy against, which they

17  stated that's what they're trying to do, our client holds no

18  accounts in the names of the defendants.  So a deposition would

19  be pointless because they would be told the same thing they're

20  not contesting here.

21         THE COURT:  Let's say hypothetically that you had the

22  access to information but you yourself had no access to the

23  accounts, so are you saying that the most that you could

24  provide to Mr. McCallum is perhaps some accounts where there

25  are some funds that you would not be able to accept a levy upon

F8ITAGUA

1    given your client's business?

2              MR. SERRITELLA:  I think, to be clear, first, we're a

3    broker-dealer that doesn't have any broker-dealer accounts in

4    the names of those defendants.

5              THE COURT:  And you also say you have no account

6    information for the other accounts for the other services that

7    Sberbank provides.

8              MR. SERRITELLA:  Correct.  And I think that the record

9    clearly shows that.  So to answer your question is yes.

10             THE COURT:  Maybe this is not a fair hypothetical, but

11   I will ask it nonetheless:  If you could provide the

12   information but you could not be an entity on whom a levy could

13   be served, do you still have to provide that information?

14   Let's say that you had access to this information but they're

15   not your accounts, and even if they found all the money they

16   were looking for, they couldn't levy on you, does that men they

17   don't get the information?

18             MR. SERRITELLA:  I think that's a separate question,

19   because we don't have to get there, your Honor, because we

20   don't have access to the information.  That's the point.  And

21   the actual information that we have in our possession isn't

22   responsive to what they're seeking and it doesn't show that in

23   the accounts where they can levy against.  So that ends the

24   analysis right there.

25             THE COURT:  Okay.  Could we please switch to the

F8ITAGUA

1    transfer motion.  You've heard my questions to Mr. McCallum

2    regarding what he anticipates taking place this week and

3    perhaps in the near term before Judge Lamberth.  Whatever you

4    would like to tell me about that, sir.

5         MR. SERRITELLA:  Your Honor, I think that what we

6    should be focusing on for this motion is what exceptional

7    circumstances mean, which is what your Honor asked.  And the

8    courts have followed the advisory committee rules that describe

9    what sort of exceptional circumstances means, and it

10   essentially comes down to the disruption of management of the

11   underlying litigation.

12        First of all, the underlying litigation is over.  It's

13   ended.

14        THE COURT:  I'm sorry, I don't mean to disagree with

15   you, sir, but there is some reason why Judge Lamberth has a

16   conference scheduled for this week.  It's not entirely over.

17   The case may be closed in the docket system, but he is still

18   doing stuff with it.

19        MR. SERRITELLA:  But I think what your Honor was

20   getting at before was the enforcement stage of the litigation.

21   Plaintiff cited no authority for the proposition that there are

22   exceptional circumstances when you're getting into enforcement

23   of a judgment against potential creditors.

24        But why don't we get into the two factors that courts

25   look at for disruption, and one of which is:  Are the same

F8ITAGUA

1    issues that are at issue in the motion to quash a protective

2    order, are they going to be addressed by the -- or have they

3    been addressed by the underlying court?  And the answer here is

4    absolutely not.  As a matter of fact, there's been no discovery

5    in the underlying litigation, there's been no motion practice

6    regarding any discovery issues whatsoever.

7              But taking a step further, what is really at issue

8    here is talking about access to documents in the possession of

9    a foreign parent.  And that issue has not come up.  And even in

10   what the plaintiff has just submitted two weeks ago, the issue

11   there of access is never -- of a foreign parent is never going

12   to come up because Ketchum is a United States entity and its

13   parent is located in the United States.  So there's no issue of

14   foreign access with regard to that entity.

15             And so I think what it comes down to is there are no

16   exceptional circumstances because the Court here would be

17   addressing the access issue for the first time and potentially

18   the only time, and the plaintiff is saying that they're going

19   to potentially send out subpoenas.  But other than the one we

20   just identified, there are no other subpoenas, and there's no

21   indication that this issue will come up because that's what

22   matters, this issue of access.  So given that it's not going to

23   come up, there's no justification of transfer to the issuing

24   court.

25             THE COURT:  You said there are two points, I want to

F8ITAGUA

1    make sure I have both of them.  The first is the issues were

2    not arising before the district judge, and the second is the

3    Ketchum case --

4         MR. SERRITELLA:  The second issue, to clarify, is the

5    issues wouldn't come up in any other districts.  So what other

6    districts are there besides this district where we have a

7    subpoena?  It's only here.

8         THE COURT:  Okay.  Anything else that you would like

9    to tell me on the transfer application?

10        MR. SERRITELLA:  Your Honor, I would like to respond

11   to the one case that -- or the two cases that the plaintiff

12   cites in his papers.  The first is the Wultz case.  That case

13   is completely distinguishable from this case.  In Wultz the

14   court was involved -- the clients were where the motion to

15   quash was made, the issuing court rather, that court was

16   already involved in the issue of access to state secrets.  As a

17   matter of fact, the two depositions that were already

18   identified or noticed dealt with the same exact issue.  And I

19   believe in that underlying litigation there were six related

20   actions.  So under those circumstances there were exceptional

21   circumstances because the court was already dealing with the

22   issues.  There were a number of related cases.  It was a

23   complex litigation.  There's nothing like that going on here.

24   This is a simple motion for a protective order where the issue

25   of access is coming up for the first time.

F8ITAGUA

1          And then with regard to the <u>Judicial Watch</u> case that

2     the plaintiff mentioned, that case actually was an ongoing

3     litigation for four years, and the issue there of privilege by

4     communicating with a state legislator was already addressed in

5     the underlying court, among many other discovery issues that

6     were similar to issues brought in the motion to quash.  So

7     again, that case was completely distinguishable and doesn't

8     support the plaintiff's argument there are exceptional

9     circumstances.

10          And I also add I don't hear that term at all.  If you

11    look at the papers there is no discussion of exceptional

12    circumstances.  The only thing we heard is a discussion of

13    judicial economy.  But as your Honor points out, Rule 45 is

14    designed to protect the local party to give the local party the

15    ability to go into court and challenge a subpoena so that

16    they're not overly burdened going to another court.  So there's

17    a presumption against transfer unless you can show the

18    exceptional circumstances.  And while judicial economy might be

19    a reason or basis for allowing a transfer, it's not the

20    standard that the Court would have to look at.  So given all of

21    that, there's no basis for transfer here whatsoever.

22          THE COURT:  Thank you very much.

23          Mr. McCallum, Mr. Serritella raises an interesting

24    point, which is that Ketchum is not going to be another entity

25    in which access to information of a foreign or domestic issue

F8ITAGUA

1    is going to come up.  So I would like to hear from you on that.

2    I also want to understand, are there more of these subpoenas

3    that you contemplate issuing, and will any them implicate the

4    issues that have brought these folks and you here today?

5         MR. McCALLUM:  Yes, your Honor.  First, with respect

6    to Ketchum, that subpoena, the time for complying has not yet

7    come to pass.  I believe it's August 20, this coming Thursday.

8    But I can argue that -- and Mr. Serritella is unaware of this

9    because I did not put it in the papers, but in discussions with

10   Ketchum they have stated that they're volunteering information

11   from their UK entity, who was one of the entities that did work

12   on behalf of the Russian government.  So while they have so far

13   not indicated that they are going to oppose on the same issue,

14   they have in fact volunteered to provide that information, and

15   that has not yet come to pass.

16        THE COURT:  That means Judge Lamberth is not going to

17   have to decide that issue, right?

18        MR. McCALLUM:  Assuming they comply and agree with

19   that, then yes, your Honor.

20        THE COURT:  Go ahead.

21        MR. McCALLUM:  With respect to additional subpoenas,

22   your Honor's second point, we do intend to send out additional

23   subpoenas for the reasons we stated in our papers and here

24   today.  Sberbank was a specific target because of all of its

25   ties with the Russian government in Russia.  We have not done

F8ITAGUA

the shotgun approach to subpoenas, but we are taking steps to
find additional entities.  For example, we submitted a FOIA
request trying to find information in regard to different
entities whose assets have been frozen under the Ukrainian
sanction regime.  Presumably when we get information from there
and start getting information back we'll look at those entities
as possible targets, and I think it is not far fetched that
another entity who is in the United States but with either a
Russian parent corporation or sister corporation and whose
assets might have Russian assets would raise the same defense
that Sberbank has done so today, and therefore we believe it
makes sense that one court, the District of Columbia, decide
those issues to prevent any inconsistent rulings.

        THE COURT:  I guess my concern, sir, is I would feel a
little more sanguine about your argument if I knew there were
other subpoenas that were in the offing that were going to
implicate the very issues that have brought these folks here
today.  And I think what I'm hearing you to say is that it's a
possibility, in fact it may even be a strong possibility in
light of the FOIA request, but today there's nothing, correct?

        MR. McCALLUM:  There's not a draft subpoena in the
works right now, your Honor.  But Mr. Serritella tries to
distinguish the Wultz case talking about other the things that
happened prior in the litigation, but the case was specifically
decided based on the fact they intended to subpoena additional

F8ITAGUA

1    entities.  So while the court did have familiarity with the

2    issues, it was a future inconsistency that they were worried

3    about, and that is why the motion to transfer, not based on any

4    specific rulings that the court already made.  The court did

5    note that Judge Scheindlin was deeply involved in the case and

6    familiar with the facts there, but that was not the basis for

7    the transfer.

8           THE COURT:  Anything else you want to tell me about

9    either application before I hear the final word from

10   Mr. Serritella, who is dying to tell me something, I can tell?

11          MR. McCALLUM:  With respect to the protective order, I

12   think your Honor is on it.  We have a disagreement about the

13   appropriate standard there.  We do submit that it's the ability

14   to access and gain that information, and that Sberbank is

15   interjecting additional requirements into the standard.

16          And with respect to the motion to transfer, we would

17   like to point out once again that Sberbank raised the question

18   of the different stages of the litigation.  And as your Honor

19   pointed out, the case is still very much active.  And while

20   Mr. Serritella states we have not provided any support for the

21   idea that Rule 45(f) contemplates the enforcement stage,

22   there's nothing that Rule 45(f) contemplates treating the

23   merits stage of litigation different from the enforcement

24   stage.

25          With that, your Honor, I rest.

F8ITAGUA

1          THE COURT:  Thank you.

2          Mr. Serritella, are you going to let Mr. Meyer talk?

3          MR. SERRITELLA:  I will respond, your Honor.

4          On the motion to transfer, a couple of points.  One,

5     the plaintiff has had years to issue subpoenas.  And while I

6     understand that they're saying that we're in the enforcement

7     stage, I believe the sanctions order was issued at least a

8     couple years ago.

9          THE COURT:  2013.

10          MR. SERRITELLA:  So two years have gone by and they

11     issued one subpoena and a second one two weeks ago.  So to say

12     that there are other subpoenas coming down the pike, it's all

13     conceptual and not even real.

14          Then secondly, with regard to the Wultz case, there

15     were two parties that were actually identified as deponents in

16     potential depositions; the plaintiffs or whoever the parties

17     were who were going to take those depositions, and those two

18     individuals were going to testify about the same issues that

19     were at issue in the motion to quash.

20          And secondly, there was an intervenor in that action.

21     The court, Judge Scheindlin, was going to oversee the first

22     deposition, so she was familiar with the issues and involved

23     with the actual deposition of the potential subpoenaed party.

24     So it's completely different than here where there is no

25     identified party with regard to an issue of access.

F8ITAGUA

1          And then I would just like to close by reiterating

2     that what this motion for protective order really turns on is

3     the legal standard of control.  And control, just to reiterate,

4     does come down to access to the relevant information in the

5     ordinary course of business.  And here the record makes very

6     clear that Sberbank USA does not have access in the ordinary

7     course of business to account level information of Sberbank of

8     Russia.

9          And to respond to a point made by my adversary, all

10     the information that they cite in their papers is not relevant,

11     it's stale news articles and reports regarding Sberbank CIB and

12     other affiliates in Russia that have no bearing on whether

13     Sberbank USA has access to account level information that the

14     plaintiff is seeking.

15          So the only thing that they cite to regarding our

16     client is a Linked In article of the declarant, Mr. Levy,

17     regarding coordination with affiliates, a four-word phrase and

18     a 250-word description at the very end of his Linked In

19     article.  And I would posit that if coordination with

20     affiliates was the basis for getting access or a basis for

21     control with regard to other affiliates, that any entity that

22     was the subject of a discovery request would have to respond on

23     behalf of other affiliates, because affiliates always

24     coordinate for the cost efficiency purposes.  Happens all the

25     time.

F8ITAGUA

1      So I would just leave your Honor with the point here

2 that a deposition is improper as a matter of law and would not

3 serve to provide the plaintiff with the information that it's

4 actually seeking because our client doesn't have the

5 information.

6      THE COURT:  Thank you to both sides.  I will step off

7 the bench for a few minutes and ask for your patience.  Thank

8 you.

9      (Recess taken)

10     THE COURT:  Let me begin by what will be cold comfort

11 to one table.  This was really excellent oral argument today

12 and really strong briefing.  And you don't know the run of the

13 mill cases that I get day after day.  This is so much better

14 than much of the argument that I see, and so it was great for

15 me.  If you could find more cases to bring my way, I would be

16 happy to have you argue any time.  So take those compliments,

17 because they are sincerely felt.  Thank you.

18     But I have already spent some time dealing with

19 looking at Rule 45(f) and looking at the advisory committee

20 notes to it, and I know that what the parties are in dispute

21 about is what constitutes exceptional circumstances, and I'm

22 aware of parties' arguments on that.

23     But one of the other things that the advisory

24 committee notes say is that it might be helpful to consult with

25 the judge in the issuing court in order to get his or her views

F8ITAGUA

1   on the situation, so I have done that.  I have spoken with

2   Judge Lamberth.  And I want to talk to you a little bit about

3   what he said.  Why don't I cut to the chase and say I am

4   transferring this so you are not sitting at the edge of your

5   seat, but let me explain to you why.

6          This is in many respects a very special case; I think

7   it is to Judge Lamberth, and I understand why it is special to

8   him.  It is a case for which he has presided for ten years.

9   And in this instance I'm perhaps less concerned about knowledge

10  of the history of the Bolshevik Revolution and the Foreign

11  Sovereign Immunities Act, but I am noting that he was with case

12  for a number of years.  He issued a default judgment in 2010

13  because the Russian Federation participated and then they

14  didn't participate anymore.  So on some level his authority was

15  flouted and his orders were flouted, and then we have a default

16  judgment.  And then we got to the point of sanctions in 2013.

17  And again, it just sort of suggests that there's a flouting of

18  his authority and his orders.

19         He is allowed to be concerned about the next phase in

20  this litigation.  He is allowed to be involved in the next

21  phase of the litigation.  And what that phase is is an effort

22  to figure out where, if anywhere, there are assets in this

23  country that can be seized to satisfy that default judgment,

24  because it does not appear today that that library can be

25  seized or the other artifacts can be seized.  I take

F8ITAGUA

1     Mr. Serritella's point that there have been years without

2     anything being done after the issuance of the default judgment,

3     and candidly, after the issuance of the sanctions order.  That

4     said, I'm not faulting Judge Lamberth for that.  He has the

5     ability and the right to make sure that this phase of the case

6     is administered in a way that minimizes the risk of

7     inconsistencies and does justice.

8            And therefore, on that front, taking Mr. McCallum's

9     point that there are more of these informational requests that

10    are likely to be coming out, and that given the structure of

11    this case, the issues of domestic and foreign access to

12    information and knowledge, which I find, by the way, very, very

13    interesting and not free from doubt, precisely because of the

14    fine arguments of the parties, I think those are interesting

15    issues and could come up again.

16           So for this reason, I find that his interests, the

17    interests of Judge Lamberth, which he communicated to me, are

18    more than conceptual, not real, as argued by Mr. Serritella,

19    and more than just an interest in judicial economy.

20           That said, I do want to minimize the cost to Sberbank

21    given the work they have done so far.  And Mr. McCallum

22    indicated that that was something that could be done, and so

23    therefore it will be done.  I'm going to ask that Chabad pay

24    for the transcript of this case, and they may consider an

25    expedited transcript to be better.

F8ITAGUA

1          I do not know if Judge Lamberth wishes to discuss this

2     at Thursday's conference or some other time, so I leave that

3     for the parties, but certainly you want to get to him the

4     transcript.  I assume that plaintiff will work to ensure that

5     there are minimal burdens, if, for example, this could be done

6     telephonically.  I certainly can ensure that Judge Lamberth

7     gets all the papers electronically so we don't have to do them

8     again.  And if there's a deposition that's going to be ordered,

9     it will take place here.

10          So I think it is additional work for Sberbank.  I

11     think we can work to minimize how much additional work it is.

12     And given that, and given the fact that I think this particular

13     case does present a species of the exceptional circumstances

14     that are contemplated by the advisory committee, and given my

15     conversations with Judge Lamberth about what he wishes to do

16     with the case, I am transferring the motion to him.

17          So I would like to have decided it.  I appreciate very

18     much your getting the information to me, and I will work now to

19     ensure that he deals with it as promptly as possible.

20          Thank you so much for coming in today, and I will let

21     you get the transcript.  Thank you.

22                              o0o

23

24

25